IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

CHRISTOPHER CAMPEN,

Plaintiff,

v.

GEO GROUP, INC.,
FNU ECCLES, in his individual capacity;
FNU HOSA, in his individual capacity;
CAMERON WILSON, in his individual capacity;
SHIRLEY JOHNSON, in her individual capacity;
BENJAMIN SCHLADER, in his individual capacity;
MIKE LEEWAYE, in his individual capacity
KIRK HAMEL, in his individual capacity; and

Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff, Christopher Campen, by and through his attorneys, David Lane, of Killmer, Lane and Newman, and Raymond K. Bryant, of the Civil Rights Litigation Group, for his Complaint and Jury Demand, states and alleges as follows:

**INTRODUCTION**

1.   This is a civil rights action for violations of Plaintiff's Eighth Amendment right to be free from cruel and unusual violence while he was incarcerated in the Cheyenne Mountain Re-Entry Center ("CMRC"). Over the course of two months, Mr. Campen was physically threatened by 2-11 gang members on several occasions. In response, Mr. Campen submitted over twenty (20) kites and repeatedly complained verbally to case

1

managers, detention staff, and investigators about the threats. But the Defendants failed to respond reasonably to abate the risk of harm presented by the continuing threats. While Mr. Campen was moved between the second and third floors of the facility, the 2-11 gang threats continued on each floor until Mr. Campen was mercilessly attacked by members of the gang.

2.  The gang members stabbed Mr. Campen multiple times and beat him until he fell unconscious. He suffered significant injuries involving his face, shoulder, back, side, ribs, chest, and other parts of his body. He has continued to suffer numerous medical complications involving muscle and nerve damage, as well as heart problems, as a result of the incident.

3.  Mr. Campen seeks compensation for his injuries, including physical pain and suffering, past and future medical costs, ongoing disability, and emotional distress, all of which was needlessly caused by the Defendants' deliberate indifference to Mr. Campen's pleas for help.

## JURISDICTION AND VENUE

4.  This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution and 42 U.S.C. § 1983 and 42 U.S.C. § 1988. The Jurisdiction of this Court is further invoked pursuant to 28 U.S.C. §§ 1331, 1343, 2201.

5.  This case is instituted in the United States District Court for the District of Colorado pursuant to 28 U.S.C. §1391 as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices and/or reside.

6.  Supplemental pendent jurisdiction is based on 28 U.S.C. §1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

7.  The state law claims in this matter are brought against private corporations or their employees and therefore no notice of claims was required under the Colorado Governmental Immunity Act ("CGIA").

## PARTIES

8.  Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

9.  Plaintiff Christopher Campen was at all times relevant to the claims set forth herein a resident of the State of Colorado.

10. Defendant GEO Group, Inc. is a registered Florida corporation with a principal office street address of 624 NW 53rd Street, Suite 700, Boca Raton, FL 33487. At all times relevant to this Complaint, Defendant Geo contracted with the state of Colorado to provide the traditional state action of running a prison and inmate detention services at the Cheyenne Mountain Re-entry Center, located in Colorado Springs, Colorado, and employed the below-identified individual Defendants to house and manage inmates therein.

11. At all relevant times, Defendant Eccles was a Detention Officer and/or Case Manager, employed by the GEO Group, Inc., and assigned to work in the CRMC Facility under color of state law. Defendant Eccles was assigned to manage and supervise inmates committed to the facility by the Colorado Department of Corrections, including Mr.

Campen, while Mr. Campen was an inmate there. Defendant Eccles is identified in her individual capacity.

12. At all relevant times, Defendant Hosa was a level II supervisory Detention Officer and/or Case Manager, employed by the GEO Group, Inc. and assigned to work in the CRMC Facility under color of state law. Defendant Hosa was assigned to manage and supervise inmates committed to the facility by the Colorado Department of Corrections, including Mr. Campen, while Mr. Campen was an inmate there. Defendant Hosa is identified in her individual capacity.

13. At all relevant times, Defendant Cameron Wilson was a Detention Officer and/or Case Manager, employed by the GEO Group, Inc., assigned to work in the CRMC Facility under color of state law. Defendant Wilson was assigned to manage and supervise inmates committed to the facility by the Colorado Department of Corrections while Mr. Campen was an inmate there. Defendant Wilson is identified in his individual capacity.

14. At all relevant times, Defendant Shirley Johnson was a Lieutenant supervisory Detention Officer, employed by the GEO Group, Inc., assigned to work in the CRMC Facility under color of state law. Defendant Johnson was assigned to manage and supervise the Special Housing Unit (SHU)) and all inmates committed or transferred to, from, and near the unit by the Colorado Department of Corrections, including Mr. Campen. Defendant Johnson is identified in her individual capacity.

15. At all relevant times, Defendant Benjamin Schlader was a supervisory Detention Officer, employed by the GEO Group, Inc. to work in the CRMC Facility

under color of state law. Defendant Schlader was a Captain and shift commander of the facility, assigned to manage and supervise detention staff and inmates within the facility, including Mr. Campen. Defendant Schlader is identified in his individual capacity.

16.     At all relevant times, Defendant Mike Leewaye was a supervisory Detention Officer, employed by the GEO Group, Inc. to work in the CRMC Facility under color of state law. Defendant Leewaye was a Captain and shift commander of the facility, assigned to manage and supervise detention staff and inmates within the facility, including Mr. Campen. Defendant Leewaye is identified in his individual capacity.

17.     At all relevant times, Defendant Hamel was a Detention Officer and investigator, employed by the GEO Group, Inc. to work in the CRMC Facility, under color of state law. Defendant Hamel was assigned to investigate Mr. Campen's complaints about the threats posed by 2-11 members. Defendant Hamel is identified in his individual capacity.

**FACTUAL BACKGROUND**

18.     Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

19.     The Cheyenne Mountain Re-entry Center is a privately run detention facility, operated and managed by the GEO Group corporation, for the Colorado Department of Corrections ("DOC"). The facility houses numerous offenders, including numerous 2-11 gang members. These gang members and their affiliation, as well as inmate threat levels and other security information for each inmate, are documented in inmate records, readily available to all DOC detention staff members, and are well-

known to detention staff employed by the facility, including each of the Defendants. Warnings, flags, and housing classifications of gang members and other inmates are required to be updated, referenced, and otherwise utilized by detention staff at all times for the safety and security of the inmates housed in the facility.

20. On or about May 17, 2017, Plaintiff Campen was on parole. His parole was revoked for a minor disciplinary violation. Mr. Campen spent approximately one month in a county jail facility and was eventually transferred to the CMRC on or about June 19, 2017.

21. Upon being transferred to the CMRC, Mr. Campen was assigned to a cell on the second floor, with several 2-11 gang members.

22. On or about July 26, 2017, Mr. Campen observed several inmates breaking facility rules, including but not limited to tattooing each other. Several 2-11 gang members saw that Mr. Campen observed the conduct and told him that they wanted him out. They threatened that if Campen did not leave the floor, they and other gang members would "whoop his ass" and "drag him out."

23. Between July 26, 2017 and July 29, 2017, Mr. Campen submitted to his case manager, Defendant Eccles, three written request forms ("kites"), asking to be moved. In the kites, Plaintiff Campen reported that his life was being threatened by three inmates, and he described that the inmates threatened to "whoop his ass" and "drag him out." Mr. Campen asked to be moved off of the floor or out of the facility.

24. On or about July 29, 2017, Plaintiff spoke directly with Defendant Eccles and explained how he was being threatened, and by whom, in detail. He sought

protection. Plaintiff was moved to the SHU.

25.   DOC regulations pertaining to the facility expressly state and provide that if the housing assignment of an inmate would be inconsistent with the safety of the inmate, the inmate should be removed and reassigned to a safe, separate, living area, either within the facility or another facility.

26.   Defendant Eccles failed to document the threats, the severity and/or nature of the threats, and/or to otherwise communicate to other detention staff and/or appropriate personnel that Mr. Campen should be moved, should not be housed with or near 2-11 gang members, and/or should be reassigned to a safe, separate living area for his protection. Defendant Eccles failed to initiate a protection protocol to ensure that Mr. Campen was housed in a protective manner during the remainder of his stay. She also failed to request a safe transfer for Mr. Campen.

27.   On or about August 1, 2017, Mr. Campen sent a kite to Defendant Johnson asking to talk to someone about the threats on his life and asking to be moved out of the facility. Defendant Johnson responded that Mr. Campen had been scheduled to be seen by Defendant Investigator Hamel and that Mr. Campen would need to provide names of those threatening him.

28.   By August 8, 2017, Plaintiff Campen had not been provided an opportunity to meet with Hamel or any other staff member about the threats. Between August 8-12, he submitted written kites to Defendant Johnson, Defendant Hosa, and Defendant Eccles describing that he had been getting threats on his life, was in fear for his life, and that he was going to be assaulted unless he was moved. Defendant Hosa

simply responded by writing on the kite form that Campen was scheduled to see his case manager. Defendant Johnson responded by writing that "I have responded to this kite." Defendant Eccles did not respond at all.

29. Defendants Johnson, Hosa, Hamel, and Eccles failed to document the threats, the severity and/or nature of the threats, and/or to otherwise communicate to other detention staff and/or appropriate personnel that Mr. Campen should be moved, should not be housed with or near 2-11 gang members, and/or should be reassigned to a safe, separate living area for his protection. The Defendants failed to initiate a protection protocol to ensure that Mr. Campen was housed in a protective manner during the remainder of his stay. They also each failed to request a safe transfer or alternate housing assignment for Mr. Campen.

30. On or about August 12, 2017, Mr. Campen was moved back to the third floor. During the next couple of days, Plaintiff was recognized by a 2-11 gang members and was, again, threatened that he would be beaten in the stairwell where no one would see him being harmed.

31. Between August 15, 2017 and September 3, 2017, Plaintiff sent eight (8) or more additional kites to Defendant Eccles, Wilson, Hosa, and Hamel, describing that he was continuing to receive threats on his life by five (5) offenders, he was scared for his life, he needed to talk to someone about the threats, and he needed to be moved and/or transferred out of the facility. The only written response Mr. Campen received was from Defendant Wilson, which response read: "Talk to your Case Manager." It was clear that the Defendants were ignoring Mr. Campen.

32. On or about September 3, 2017, Mr. Campen again communicated the threats that had been made to detention staff, including Captain Schlader, and he urged Detention staff not mto make him go refused to goback to the dangerous environment because he was afraid. Without appropriate help from the Defendants that he had informed, he was forced to take the self-protective measure of refusing to go back. As a result, he was sent to the SHU as a punishment.

33. Defendant Captain Schlader failed to document the threats, the severity and/or nature of the and/or to otherwise communicate to other detention staff and/or appropriate personnel that Mr. Campen should be moved, should not be housed with or near 2-11 gang members, and/or should be reassigned to a safe, separate living area for his protection. Defendant Captain Schlader failed to initiate a protection protocol to ensure that Mr. Campen was housed in a protective manner during the remainder of his stay. He also failed to request a transfer for Mr. Campen.

34. On September 4, 2017, Mr. Campen was finally permitted to speak with Defendant Investigator Hamel. Mr. Campen explained that he had been repeatedly threatened and that his life was in danger. Mr. Campen fully cooperated and provided details about the threats, as requested. Defendant Hamel informed Mr. Campen that he would speak to detention officers in the pod to have something done, but it does not appear that Defendant Hamel appropriately communicated, documented, or otherwise took any action to protect Mr. Campen.

35. On September 5, 2017, Defendant Captain Schlader told Mr. Campen that he would have to go back to the third floor. Mr. Campen protested and explained that he

had been threatened by 2-11 members and could not go back. Defendant Schlader demanded that Mr. Campen go back to the third floor, despite the threats, and threatened disciplinary action.

36. On September 6, 2017, Mr. Campen submitted a kite to Defendant Captain Schlader, describing that he "cant go back to GP on floor with threats I am getting please transfer to DRDC." Defendant Schlader did not respond.

37. On September 7, 2017, Defendant Captain Schlader filed disciplinary charges against Mr. Campen for failing to leave his cell. Mr. Campen explained in person and in kites to the captain that he could not go back because his life was being threatened – the 2-11 gang threats had escalated to threats of beatings and death threats. Defendant Schlader did not act in any way to protect Mr. Campen.

38. Defendant Schlader fully understood the nature of Mr. Campen's complaints, his legitimate fear in the face of the threats, and the gravity of the risk to Mr. Campen, even as he sought to downplay them. The disciplinary notice that Defendant Captain Schlader filled out and signed read as follows:

> On the date of 09/07/2017 at approximately 1025 hours O/C Fox gave resident Campen, Christopher #14417 a direct order to return to his POD. He refused stating there were resident problems with him on the pod. He stated he would go anywhere else but the pod he came from.

39. On or about September 10, 2017, Plaintiff Campen wrote a detailed letter to Defendant Johnson, describing his meetings with Hamel and Schlader, and describing that the prior Tuesday he had been threatened by five (5) inmates who had Campen's name on a hit list. Campen described that he had been threatened in pods 2B, 3A and 3B and could not go back to any of them. Campen described that another inmate warned him

10

that there was a plan to attack Campen in the bathroom or his cell. Plaintiff Campen pleaded that he be moved out of the facility and pleaded for a safe place to spend the final 30 days he had remaining until his parole date of 10/10/2017.

40. Between September 8 and 13, 2017, Mr. Campen verbally re-raised the issue of the threats to detention officers who did rounds near him, including to Defendant Johnson, and to case managers, including Defendant Eccles and Hosa. But these Defendants did not properly document or otherwise act to protect Mr. Campen.

41. On the morning of September 13, 2017, a hearing was held on the disciplinary charges. Plaintiff explained the ongoing threats from the 2-11 gang members to a panel, including Captain Schlader and Captain Mike Leewaye. Based on Mr. Campen's detailed description of the danger he was placed in, the disciplinary charges levied against Campen were dismissed. But the Captains decided to send Plaintiff Campen back to general population on the second floor. Plaintiff vociferously objected, explaining the threats, and communicating the gravity of the threats facing him in numerous ways, including by communicating that the detention officers would "have blood on their hands" if they forced him to go out on the floor. But the Captains did not change their mind. The captains did not place Mr. Campen in protective custody or otherwise implement any type of inmate protection protocol – to the contrary, the captains affirmatively assigned Mr. Campen to a housing assignment on the second floor, with 2-11 gang members, where Mr. Campen would be in danger.

42. On September 13, 2017, Defendants Captain Schlader, Mike Leewaye, and Defendant Johnson transferred Mr. Campen to a second floor cell, where four other

2-11 gang members were housed. Direct communications from Mr. Campen, inmate records, communications between staff, and other information readily available and/or known by these Defendants would have obviously indicated this to be a dangerous housing assignment for Mr. Campen. However, the Defendants placed him there anyway.

43. On the evening of September 13, 2017, the gang members assigned and/or associated with his cell/pod gathered together approximately four or five other inmates, for a total of approximately eight or nine assailants. The group pulled Mr. Campen from his bed to the floor, stabbed him repeatedly, slammed his head on the ground, and beat him until he fell unconscious.

44. Security staff reported finding Mr. Campen in front of his cell dazed, confused, and asking what happened. Mr. Campen had abrasions over his nose and forehead, noticeable tissue swelling across his face, eyes, and his left ear, and he was bleeding. Mr. Campen had obviously been assaulted.

45. Mr. Campen was taken to Penrose Hospital. The ambulance report described that Campen was actively worried about being attacked. The emergency room records describe that Mr. Campen pleaded for doctors not to let him die.

46. Mr. Campen suffered multiple stab wounds to his arm and back/side, three broken ribs, two broken teeth, a torn rotator cuff, chest pains (that later required a heart stint), degeneration of his eye, nerve damage in his spine with accompanying weakness in his shoulder, arm, and hand (which weakness continues to this day), black eyes, facial swelling, loss of hearing, and other indicia of the beating, including bruising, lacerations, wounds, and scarring.

47. Mr. Campen has had three surgeries to repair his rotator cuff and bicep, heart, and right eye.

**FIRST CLAIM FOR RELIEF**
*42 U.S.C. § 1983 Eighth Amendment Violation –*
**Deliberate Indifference to Inmate Safety & Failure to Protect**
**(Against All Defendants)**

48. Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

49. From July 26 to September 13, 2017, Plaintiff Campen repeatedly put the Defendants on notice via written kites and verbal conversations that he had been threatened by 2-11 gang member offenders and that his life was in danger.

50. Each of the Defendants received individual notice through kites and individual conversations, and had an opportunity to act, over the course of approximately two months, but failed to protect Plaintiff Campen.

51. Although Plaintiff Campen was moved approximately three times, he was repeatedly moved back to and was required to remain on either the second or third floors – where the Defendant detentions officers, case managers, investigators, and Plaintiff Campen knew threatening 2-11 gang members were being housed, which presented an imminent danger to Mr. Campen.

52. Plaintiff was not permitted to remain in the SHU, he was not placed in protective custody, and he was not transferred out of the facility, despite the repeated threats from gang members on each of the floors Mr. Campen was sent and the repeated communications from Mr. Campen conveying the continuing threats. Instead, Mr. Campen was forced back to the dangerous environment he complained of and punished when Mr.

Campen tried to take steps to remain safe, himself. Reasonable steps were not taken by any of the Defendants to keep Mr. Campen in a secure, safe, housing situation despite their knowledge of the risks.

53. Despite the obvious dangers, Plaintiff Campen was affirmatively transferred back to general population, to the second and third floors, and ultimately transferred to a second floor cell where inmates with obvious 2-11 gang affiliation were housed. Mr. Campen was disciplined for trying to stay safe and otherwise effectively ignored when Mr. Campen raised further concerns about the threats.

54. On September 13, 2017, Plaintiff Campen was assaulted by the gang members.

55. Defendants failed to act in numerous ways, in the face of the numerous written and verbal notices provided to them by Mr. Campen, up until the day he was assaulted by a large group of gang members. This conduct, in the face of known risks to Mr. Campen's safety, constituted deliberate indifference, pursuant to the Eighth Amendment, and proximately caused Plaintiff Campen serious physical and emotional injuries, including but not limited to pain and suffering, emotional distress, impairment of the quality of life, medical costs and other damages listed above, and injuries expected to be long-lasting and/or permanent in nature.

56. Defendant Geo Inc., is responsible for the deliberate indifference of its employees, who acted under color of law by and on behalf of the corporate entity, via

respondeat superior.[1]

**SECOND CLAIM FOR RELIEF**
**§ 1983 – Supervisory Liability for Failure to Train and Supervise**
**(Against Defendants Lietenant Johnson, Captain Leeweway, Captain Schlader, and GEO Group, Inc - "Supervisory Jail Defendants")**

57. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

58. The Supervisory Jail Defendants each have duties to train and supervise other jail personnel in order to ensure the safety and well-being of detainees in facility.

59. Each of the Supervisory Jail Defendants failed to discharge these duties.

60. The Supervisory Jail Defendants acted intentionally and/or recklessly in failing to adequately train and supervise other jail personnel to ensure the safe housing of Mr. Campen – both before and after Mr. Campen put them on notice of the risks to his safety.

61. The Supervisory Jail Defendants' failure to properly train and supervise their subordinate employees was the moving force and proximate cause of the violation of Mr. Campen's constitutional rights.

62. The acts or omissions of the Supervisory Jail Defendants caused Mr. Campen damages in that he suffered extreme physical and mental pain during the months leading up to the inevitable beating, and during the beating.

---

[1] Plaintiff intends to argue that the 10th Circuit case *Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 946 (10th Cir. 2005), was wrongly decided and that respondeat superior should apply to private entities, such as GEO Group, Inc., in § 1983 actions. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 795 (7th Cir. 2014) ("For all of these reasons, a new approach may be needed for whether corporations should be insulated from respondeat superior liability under § 1983. Since prisons and prison medical services are increasingly being contracted out to private parties, reducing private employers' incentives to prevent their employees from violating inmates' constitutional rights raises serious concerns. Nothing in the Supreme Court's jurisprudence or the relevant circuit court decisions provides a sufficiently compelling reason to disregard the important policy considerations underpinning the doctrine of respondeat superior. And in a world of increasingly privatized state services, the doctrine could help to protect people from tortious deprivations of their constitutional right."). In any event, all the institutional Defendants in this matter are legally culpable whichever standard of institutional liability is applied.

63. The actions and inactions of the Supervisory Jail Defendants as described herein deprived Mr. Campen of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused her other damages.

64. Defendant Geo Inc., is responsible for the deliberate indifference of its employees, who acted under color of law by and on behalf of the corporate entity, via respondeat superior.

### THIRD CLAIM FOR RELIEF
*Common Law Negligence –*
**(Against all Defendants)**

65. Plaintiff hereby incorporates by reference, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

66. Defendant GEO Group, Inc., has breached its duty of reasonable care due to Mr. Campen by negligently operating the facility and by theory of *Respondeat Superior*.

67. Defendants Eccles, Hosa, Wilson, Johnson, Schlader, Leewaye, and Hamel are private individuals..

68. None of the Defendants are entitled to any immunity under the Colorado Governmental Immunity Act ("CGIA") or otherwise.

69. Defendant GEO Group, by and through Defendant employees who operated in the course and scope of their employment, have failed to take reasonable precautions to house and keep safe inmates, including Mr. Campen.

70. Defendants' duties of care are informed by state law. For example, under C.R.S. § 16-3-401, "persons arrested or in custody shall be treated humanely and

provided with adequate food, shelter, and, if required, medical treatment." The provision of humane treatment is a statutory obligation and/or is guaranteed by other legal obligation. Defendants also had a common law obligation to protect Mr. Campen from harm.

71. Defendant Geo Group failed to enact sufficient and/or appropriate polices, practices, training, supervision, record-keeping or communication regarding inmate safety to provide appropriate housing for the protection of those threatened by gang members within the facility, including Mr. Campen.

72. All Defendants have failed to appropriately implement DOC regulations that expressly require appropriate documentation and housing assignment changes, up to and including removal and reassignment to safe, separate living areas within or outside of the facility.

73. All Defendants failed to act in accordance with an appropriate standard of care to meet DOC regulations and/or National Correctional Standards to ensure the safety of Mr. Campen after he communicated he was threatened and remained in danger.

74. All Defendants had information and personal knowledge regarding the need to act to protect – and keep safe– Mr. Campen after he was threatened and continued to be threatened by a readily identifiable group of gang-affiliated inmates. These Defendants willfully and wantonly acted in a manner that placed Mr. Campen in danger or refused to act in reckless disregard for the rights and safety of Mr. Campen after Mr. Campen communicated that he was in danger.

75. As the direct and proximate result of Defendants' actions and omissions to

act in accordance with appropriate standards of care, Mr. Campen was attacked by persons whom Defendants knew or should have known would be dangerous to him.

76.     Defendant Geo Group is vicariously liable for the negligent acts and omissions by its agents and/or employees.

77.     As a further direct and proximate result or substantial factor of Defendants' actions and omissions to act in accordance with the proper standards of care, Mr. Campen has suffered significant injuries including but not limited to those for pain and suffering, emotional distress and impairment of the quality of life, medical costs and other damages listed above, some of which are expected to be long-lasting and/or permanent in nature.

**WHEREFORE**, Plaintiff respectfully prays that this Court enter judgment in his favor and against the Defendants for compensatory damages, as referenced above and in Plaintiff's disclosure statements, for punitive damages, costs, expert witness fees, prejudgment interest, and reasonable attorney's fees as allowed by law, and for any other and further relief that this Court shall deem just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 3rd day of July, 2019.

CIVIL RIGHTS LITIGATION GROUP

*s/ Raymond K. Bryant*
Raymond K. Bryant
1543 Champa St., #400

Denver, CO 80202
P: (720) 515-6165
raymond@rightslitigation.com

KILLMER, LANE & NEWMAN, LLP

David A. Lane
1543 Champa Street, Suite 400
Denver, Colorado 80202
(303) 571-1000
dlane@kln-law.com
tvaldez@kln-law.com

ATTORNEYS FOR PLAINTIFFS